## AUSA LIFE INSURANCE COMPANY, et al., Plaintiffs,

v.

## ERNST & YOUNG, Defendant.

### No. 94 Civ. 3116 (WCC).

United States District Court, S.D. New York.

Oct. 11, 2000.

Cadwalader, Wickersham & Taft, New York City (Debra Brown Steinberg, Edwin David Robertson, of counsel), Morgan, Lewis & Bockius LLP, Washington, D.C. (Peter Buscemi, of counsel), for Plaintiffs.

Mayer, Brown & Platt, Chicago, IL (Alan N. Salpeter, Michele Odorizzi, Howard J. Roin, Caryn Jacobs, Linda T. Coberly, of counsel), Ernst & Young LLP, General Counsel's Office, New York City (Kathryn A. Oberly, Patricia A. Connell, of counsel), for Defendant.

## SUPPLEMENTAL FINDINGS OF FACT

WILLIAM C. CONNER, Senior District Judge.

This Court, having reviewed the record in light of the several opinions of the Court of Appeals for the Second Circuit remanding the case for additional findings of fact on the issue of loss causation, as well as the briefs and proposed findings submitted by the parties, hereby makes the following Supplemental Findings of Fact:[1]

**I. Plaintiffs did not Prove that JWP's Default was the Foreseeable Result of Risks or Weaknesses Concealed by E & Y's Misrepresentations**

**A. JWP's Financial Position Before the Businessland Acquisition**

1. In the early 1980s, JWP was a relatively small company whose business consisted primarily of operating a regulated water utility on Long Island, New York. (991 F.Supp. at 238.) JWP began to grow significantly in the early-to-middle 1980s by acquiring construction companies primarily in the New York market. (Tr. 4468 (Dwyer).) In 1987, JWP developed a strategy to become a national electrical and mechanical contractor. (*Id.*) Because JWP's management believed that size was

---

1. This Court's previous findings of fact will be cited herein as "FF." The parties' proposed findings both before and after trial will be cited "PFF." For example, Plaintiffs' Proposed Post–Trial Findings of Fact will be cited as "Pl. Post–Trial PFF."

important to its success in handling the new, larger contracting projects, JWP stepped up its strategy of growth by acquisition. (*Id.*) By 1990, JWP had acquired more than 100 companies and had reached $1.5 billion in assets and well over $2 billion in revenues. (DX 138 at 22.) It thereby had become the largest specialty contractor, the largest mechanical contractor, and the largest electrical contractor in the United States. (Tr. 4465–66 (Dwyer).)

2. In the years leading up to the Businessland acquisition (*see* Supplemental Finding 8), JWP was not in an "increasingly precarious financial position," as plaintiffs suggest. (Pl.Mem. at 12.) Indeed, the evidence shows that JWP was becoming not only larger but financially stronger throughout that period. Although JWP's reliance on financing through the issuance of debt securities had made it highly leveraged and relatively recession-sensitive, (991 F.Supp. at 238), there is no evidence that JWP was in even remote danger of collapse before it acquired Businessland, even after all of the income inflation was removed from JWP's operating results. Indeed, JWP would not have defaulted on its debt obligations but for its acquisition of Businessland, which turned out to be "a veritable sinkhole for cash." (*Id.* at 250.)

3. JWP's reported cash flow from operations was $8.3 million in 1987, $22.9 million in 1988, $6.6 million in 1989, and $85.8 million in 1990. (991 F.Supp. at 250.)

As defendant's expert, Professor Fischel, explained: "if you look at the cash flow, the dollars that [will] be used to repay the bondholders," JWP's condition was actually "much better in 1990 than it had been in previous years." (FF 456 (quoting Tr. 6473).)

4. In addition, from 1987 to 1990, even after the correction of all the proven accounting errors, JWP's financial statements would still have shown a substantial and growing equity cushion to protect the noteholders. Even without the inflation, JWP's assets in 1987–1990 would have more than covered its debts, including its

obligations to the noteholders. (FF 453; *see also* FF 457–61.) Thus, plaintiffs' investments were "much better protected in 1990 than they were in 1987." (FF 462 (quoting Tr. 6462).)

5. At trial, plaintiffs' expert, Dr. Livingstone, testified that during the 1987–1990 period, JWP inflated the income reported in its financial statements by a total of approximately $183 million. (Tr. 346–47, 651–52; PX 1595; PX 1598.)

Dr. Livingstone's computations, however, were seriously flawed. (991 F.Supp. at 246.) For example, he assumed that, if a customer owed a certain amount in an earlier year and an equal or greater amount in a subsequent year, the account was of questionable collectibility and should have been discounted or written off altogether, despite undisputed evidence that most of the accounts were repeatedly rolled over, with amounts owed earlier having been fully paid and replaced by later billings. (FF 308–18.)

Moreover, Dr. Livingstone's credibility was weakened by the fact that his original opinion, as expressed in discovery depositions and answers to contention interrogatories, was that 1990 pre-tax income had been overstated by only $67 million, which would still leave net income of $26 million. It was not until after the Court ruled that the audited annual reports for 1991 and later years were not relevant (because those reports were not issued until after plaintiffs' last purchases of JWP's notes), a ruling which gave plaintiffs a strong incentive to push the overstatement of earnings back to 1990 and earlier, that Dr. Livingstone expressed a new opinion which exactly doubled his calculation of the overstatement of 1990 pre-tax earnings. (991 F.Supp. at 246.)

6. Plaintiffs failed to prove that JWP's 1990 financial statements were misstated to any greater extent than was corrected in the subsequent restatement. That restatement, completed in 1994 after extensive review by Deloitte & Touche and E &

Y, reduced pre-tax net income by only 11%, from $93 million to $83 million and after-tax net income by only 15%, from $59 million to $50 million. (*Id.* at 249–50; FF 61; *see also* FF 303–05.)

7. There was no restatement of the annual reports for the prior years 1987–1990 following the review by Deloitte & Touche and plaintiffs failed to prove the amount of the overstatement of net income in those years. Even if Dr. Livingstone's analysis had been fully credible, and if all of the income inflation which he claimed were corrected, JWP's financial statements would still show positive net income of $36 million in 1987, $26 million in 1988, and $37 million in 1989. (PX 1559.) There is no evidence that even such reduction of JWP's income in those years would have increased the risk of default, either in terms of JWP's ability to make good on its notes, or in terms of its ability to withstand the serious financial difficulties it encountered in 1992 and 1993.

## B. The Decision to Proceed with the Businessland Acquisition was not Related to Management's Desire to Conceal the Accounting Abuses

8. JWP acquired Businessland, Inc., a retailer of computers and supplier of software and related services, in the latter part of 1991. (991 F.Supp. at 238.)

9. JWP Chairman Andrew Dwyer and other members of JWP's management proceeded with this acquisition in the sincere belief that it was a good business opportunity. Although Businessland was in "serious financial trouble" before the acquisition, JWP's executives believed they could turn the company around by converting it from a "box pusher" reselling computer hardware into a higher-margin "value-added" systems integrator supplying to large corporate clients their full computer needs. They saw in Businessland's existing clientele of Fortune 1000 companies and trained sales force the nucleus of a potentially dynamic and profitable organization which would mesh well with their successful electrical contracting business, already heavily involved in the installation of wiring for complex corporate computer networks. (*Id.; see also* FF 31–38; *see generally* Tr. 4516–19, 4664–66 (Dwyer) (describing strategy).)

10. Plaintiffs were aware of JWP's strategy for turning Businessland around and concluded, based upon their own market analysis, that it "did make a lot of sense." (Tr. 113–14 (Simpkins); *see also* Tr. 5748–49 (Heintz) (JWP had a strategy for turning Businessland around, and Prudential became comfortable with that strategy after discussions with management).)

11. Plaintiffs presented no evidence that the Businessland acquisition was actually motivated by management's desire to close the gap created by their inflation of reported income, or by fear that their fraud would be disclosed. There is also no evidence that JWP's management believed that the exposure of either the fraud or JWP's true financial condition would have had such dire financial consequences that management was "tempt[ed] ... to take on even greater risk in order to hide the fraud." (Pl.Mem. at 12.)

12. JWP did have difficulty obtaining financing after the fall of 1992. But this difficulty was not because of the revelation of accounting abuses. Rather, it was the result of the disclosure of massive business losses and negative cash flow in 1992 and 1993. There is also no evidence that any potential lender was scared off in late 1992 or 1993 by the possibility that it would be defrauded in the future. By that time, Ernest Grendi had been unseated as CFO (FF 19) and Deloitte & Touche had been retained as the new outside auditor. (FF 502.) Accordingly, plaintiffs have not proven that the disclosure of the alleged fraud was causally related to JWP's demise.

13. E & Y had no duty to disclose management corruption *per se*. "The auditor's responsibility is to express an opin-

ion" on whether the client's financial statements "present fairly, in all material respects, [its] financial position, results of operations and its cash flows in conformity with generally accepted accounting principles." (FF 252 (quoting AU § 110.01–01).) But, under GAAS, E & Y was not required "to blow the whistle" on management by disclosing its desire to make the numbers look even better than they were.

14. In sum, there is no evidence that JWP acquired Businessland because management was tempted to take unwarranted risks in order to hide their accounting fraud or to salvage a precarious financial condition.

### C. The Businessland Acquisition Would have Caused JWP's Demise Even if JWP's Financial Condition had been as Represented

15. The acquisition of Businessland and its integration into JWP's existing Information Services ("I/S") division was much more difficult and expensive than JWP anticipated. (FF 42.) JWP was immediately faced with the burden of advancing funds to Businessland to meet its operating expenses. The planned closure of most of Businessland's retail stores took longer and cost more than expected. (991 F.Supp. at 239; see also FF 39.) Beyond that, the Businessland acquisition caused disruption within JWP's management, and a mass exodus of experienced executives. (FF 40.) The consolidation of Businessland and JWP's existing I/S business was much more difficult than management expected. (FF 42.) As a result of these unanticipated problems, the I/S division became a massive cash drain on the rest of JWP and a significant distraction for its management. (FF 44.) In terms of strategy, timing, and implementation, the Businessland acquisition tuned out to be a catastrophe. (FF 46.)

16. Moreover, the acquisition coincided with a period of intense competition in computer sales, commonly referred to as the "PC price wars." (991 F.Supp. at 239; see FF 47–53.) This factor, in combination with a downward trend in office construction adversely affecting JWP's mechanical & electrical ("M & E") division, resulted in substantial losses. (991 F.Supp. at 239; see FF 54–59.)

17. The vast majority of the write-offs JWP took in 1992 were caused by the upheaval in the computer industry, the financial pressures imposed by the Businessland acquisition, and the poor economic conditions in the M & E business. (FF 63; see also FF 64–66.)

18. JWP suffered a net loss of $612 million in 1992. Moreover—and of greater concern to long-term lenders—JWP had a negative cash flow in 1992 of $49.6 million. The equity cushion protecting JWP's noteholders dropped in 1992 to negative $176 million. (FF 67.) JWP's difficulties continued throughout 1993, with an additional net loss of $123 million and negative cash flow of $44 million. Moreover, the equity cushion protecting JWP's noteholders dropped to negative $302 million by the end of 1993. (FF 68.)

19. In sum, JWT collapsed and was unable to satisfy its debt obligations "because of the unsuccessful Businessland acquisition[,] combined with deteriorating conditions in the information services industry and the inability of the other businesses that JWP was involved in, particularly the M & E business, to make up for those losses." (FF 76 (quoting Tr. 6447).)

20. Plaintiffs failed to prove that if JWP's financial condition had been as represented, JWP could have weathered the storm and maintained solvency. Indeed, the evidence clearly shows just the opposite: that the Businessland acquisition and the problems in the I/S and M & E businesses would have caused JWP's insolvency and default even if its financial condition had been fully as healthy as was represented in its annual reports. (991 F.Supp. at 254.)

## D. JWP's Failure was not the Result of a Long–Standing and Concealed Flaw in its Acquisition Strategy

21. JWP's ultimate collapse was not a manifestation of some long-standing problem in JWP's acquisition strategy, concealed in previous years by faulty accounting.

22. JWP's acquisition strategy was certainly aggressive, and plaintiffs were well aware of that fact before they invested in JWP. (See, e.g., Lumpris Dep. at 72 (Prudential's focus in due diligence discussions was concern about JWP's "exploding growth"); id. at 85 (Prudential analyst describes JWP's "acquisition splurge").)

23. But there is no evidence that the strategy was failing. To the contrary, JWP became larger and stronger between 1987 and 1990, even without the misleading inflation of assets and income.

24. The Businessland deal was a radical departure from JWP's previous acquisition strategy. Businessland was by far JWP's largest and riskiest acquisition. (991 F.Supp. at 238.)

25. Businessland also represented a massive expansion into an industry that was relatively new to JWP. JWP's first major involvement in computer reselling had been its acquisition of NEECO in May 1990. Just over a year later, through the Businessland acquisition, JWP dramatically increased its stake in the computer industry, roughly doubling the size of its existing I/S business in terms of assets and sales volume. With this acquisition, JWP became the largest computer reseller in the United States. (FF 34.)

26. The most significant difference between the Businessland acquisition and JWP's prior acquisition strategy, however, was that Businessland was seriously troubled financially when it was acquired. That fact made the Businessland acquisition "definitely different" from its predecessors; JWP's strategy beginning in the mid–1980s had been to acquire "stronger" companies. (Tr. 4662 (Dwyer).) The acquisition of Businessland, with its enormous continuing losses, was altogether inconsistent with that established strategy. (FF 35 (quoting Tr. 4720–21).)

## E. Plaintiffs did not Prove that they Held Their Notes because of Anything E & Y Said or Did

27. There is no evidence that plaintiffs held their notes instead of selling them because of the inflation of assets and income in the financial statements audited by E & Y.

28. Plaintiffs always viewed JWP's notes as long-term investments and intended from the beginning to hold them to maturity. The notes had maturities of either ten or fifteen years. They were "illiquid, not regularly tradable securit[ies], and [the plaintiffs were] purchasing them with the intent to hold, not to trade in the secondary market." (FF 419 (quoting Tr. 5189).) Indeed, the Note Agreements included specific representations from plaintiffs confirming this intention. (FF 421.)

29. There is also no evidence that plaintiffs would have declared a default and accelerated the notes if the truth about JWP's 1987–1990 financial statements had been revealed after they purchased their notes. Instead, the evidence establishes that plaintiffs considered acceleration to be "an extreme remedy that is . . . generally not used where its effect would be to worsen a company's condition and thereby undermine the noteholders' ability to safeguard their investments." (Pl. Cont. Interrog. Resp. at 65.) There is no evidence and no logical reason to believe that plaintiffs would have taken such drastic action upon discovery of non-cash financial statement errors of the magnitude proven here.

## F. The Events that Caused JWP's Collapse were not Foreseeable to E & Y During the Audits in Question

30. The confluence of events that caused JWP's collapse—the disastrous

Businessland acquisition, the PC price wars, and the downturn in the M & E business—was unforeseeable to E & Y when it issued the audit opinions and negative assurance letters at issue here. (991 F.Supp. at 250–54.) These factors all materialized after the audits at issue in this case—that is, the audits of JWP's 1987–1990 financial statements. (FF 76.)

31. It was not foreseeable to E & Y at the relevant times that JWP would undertake an enormous and unprecedented acquisition in the computer business, let alone that such an acquisition would turn out to be a disaster. As discussed above, the Businessland acquisition represented a massive expansion into an industry in which JWP had first become involved only fifteen months earlier. (FF 34.) During the 1987–1989 audits, it was not foreseeable to E & Y that JWP would even become involved in computer reselling. Moreover, JWP's explosive growth into the largest reseller in this industry was not foreseeable to E & Y during any of the audits at issue here.

32. More importantly, E & Y could not have foreseen, based on its knowledge of JWP's previous acquisition strategy, that the single largest acquisition in JWP's history (FF 31) would involve a company that was near bankruptcy. JWP's strategy beginning in the mid–1980s had been to acquire "stronger" companies. (Tr. 4662 (Dwyer).) Accordingly, JWP's acquisition of the seriously troubled Businessland was not foreseeable in the light of JWP's prior acquisitions.

33. Moreover, many of the problems associated with the Businessland acquisition were not anticipated even by JWP's own management and did not arise until after the acquisition had taken place. According to CEO Andrew Dwyer, "[JWP] had the greatest problems ... in June 1992." (FF 42 (quoting Tr. 4532–33); *see generally* Tr. 4528–34 (Dwyer) (the massive integration costs were not apparent until after the deal had closed); Clancy Dep. at 330–31 (Businessland's perfor-

mance after the acquisition was not as good as management or Prudential expected for a number of reasons, including price wars, high integration costs, and management turnover).)

34. The dramatic price competition in the computer industry came as a surprise to JWP and could not have been foreseeable by E & Y. It was not until early 1992—several months after E & Y concluded the last audit (1990) at issue in this case—[that] "computer prices ... went into free fall...." (FF 48 (quoting Bielski Dep. 219).)

35. Most importantly, the evidence at trial showed that, given the nature and extent of the accounting errors, it was not foreseeable to E & Y that the errors would lead to JWP's inability to meet its payment obligations on the notes. Plaintiffs were purchasing debt securities, and their main concern was JWP's cash flow and its ability to pay interest and principal. (991 F.Supp. at 250.) Virtually every one of the errors found in JWP's books involved non-cash items which did not affect JWP's cash balances or its actual cash flow. (*Id.*) Thus, the errors did not conceal any negative trend in cash flow and had no effect on JWP's ability to discharge the obligations for principal and interest on its debt. (*Id.;* FF 450–62.)

36. For this reason, E & Y could not have foreseen that any condition hidden by the financial statements would lead to JWP's inability to repay its debts. Indeed, JWP's notes were not in fact materially riskier than plaintiffs believed them to be. Even after correcting all of the accounting errors, the value of the notes on the date of purchase—which would take into account the relative riskiness of the notes—would not have been appreciably different if potential investors had been aware of JWP's true financial condition at the time. (Tr. 6480–81 (Fischel).)

37. If E & Y had been unwilling to issue an unqualified audit opinion because of the errors in the financial statements, it

would necessarily have discussed the matter with JWP during the course of the audit. (*See, e.g.,* Tr. 310 (Simpkins).) In all likelihood, faced with the possibility of a qualified audit opinion and the resultant business problems, JWP would have made the necessary changes to its financial statements during the audit. No lengthy restatement process would have been necessary; JWP had the power to, and most likely would have, corrected its financial statements during the audits themselves. (*See, e.g.,* MONTGOMERY'S AUDITING § 28.29 (12th ed. 1998) ("Adverse opinions are rare. It is *obviously better for all* concerned to correct the conditions before such an opinion is issued, and it is usually within the entity's power to correct them.").)

Given the relatively small effect the corrections would have had on JWP's financial statements, it is highly improbable that JWP would have refused to make the changes when threatened with a qualified opinion.

## II. Plaintiffs' Claim that E & Y's Representations "Enabled" the Businessland Acquisition to Take Place was Waived

38. On appeal and now on remand, plaintiffs argued that loss causation is established because E & Y's misconduct foreseeably "enabled" JWP to acquire Businessland, which caused JWP's collapse. They reason that the Note Agreements prevent mergers of subsidiaries of JWP with outside corporations if JWP was in default of any covenants of the Note Agreements at the time of the merger or within 90 days there to fore. One of those covenants required that JWP's books be kept in accordance with GAAP, and JWP was in violation of that covenant.

39. E & Y contends that the Note Agreements were not violated by the Businessland acquisition because it was accomplished in two stages: (1) the tender offer to purchase 51% of Businessland's common stock, which was completed in August 1991; and (2) the takeout of the minority shareholders through an exchange of JWP shares, which was effected several months later. E & Y contends that each of these stages was expressly permitted by the Note Agreements, for example, stage 1, by PX 134A, pp. 39–40 and stage 2 by PX 134A, ¶ 6G(c). Plaintiffs counter that such a breaking down of the transaction into two stages violates the intent of the Note Agreements because a full merger, including both stages, was contemplated from the beginning.

The Note Agreements do not unambiguously support the contract construction urged by either side, and parol evidence would therefore have been admissible to establish the intent of the contracting parties. However, the belated advancement of this contention by plaintiffs deprived E & Y of the opportunity to introduce such evidence at the trial.

40. Plaintiffs' theory at trial and in their post-trial proposed findings was that JWP failed, not because of the disastrous Businessland acquisition and other external factors, but rather because of concealed financial weaknesses that had existed for years. (*See, e.g.,* Pl. Pre–Trial PFF 245; Pl. Post–Trial PFF 526–634, 746.) Indeed, plaintiffs took the position that the Businessland acquisition was a success. (*See, e.g., id.* 532–55, 591–92; *id.* 535 (Businessland was a "successful acquisition as of year-end 1991"); *id.* 746(f) ("The Businessland acquisition did not bring down JWP."); Pl.Supp. Post–Trial PFF 320 (Businessland "made a positive contribution").)

41. It was not until page 204 of plaintiffs' post-trial reply submission—to which E & Y had no opportunity to respond—that plaintiffs intimated that they might be advancing an alternative version of the facts as proof of loss causation. (*See* Pl. Supp. Post–Trial PFF 323.)

42. Contrary to *plaintiffs' contention,* the colloquy at pages 6123–26 of the trial transcript did not put anyone on notice of

plaintiffs' current "enabling" argument. During trial, plaintiffs' counsel asked a witness from Crown Life whether anyone was assigned to monitor the investment in JWP. When E & Y's counsel objected on relevance grounds, plaintiffs' counsel commented that if any of the no-default certificates issued by E & Y "had disclosed the truth, the likelihood of the Businessland acquisition [ ] having occurred would be nil." (Tr. 6124.) Counsel elaborated that "with the absence of the no-default certificates, the lenders ... have a major say in what that company, JWP in this case, is allowed to do." (Tr. 6124–25.) Counsel for E & Y objected that the evidence was speculative and irrelevant, and the Court sustained the objection. (Tr. 6126.) The Court did not interpret these brief and isolated comments by counsel, made in response to an evidentiary objection, to be an assertion of a new loss causation theory, particularly when that theory was absent from plaintiffs' detailed 86–page complaint and from their post-trial proposed findings of fact and conclusions of law and did not appear until late in plaintiffs' post-trial supplemental proposed findings.

43. Accordingly, neither E & Y nor this Court was on notice during trial that plaintiffs would be asserting the alternative theory that E & Y was liable, even if Businessland was the cause of JWP's demise, because E & Y "enabled" the Businessland acquisition to take place. Because plaintiffs failed to raise this argument in a timely manner, it would be unfair for them to recover on that basis without E & Y being given an opportunity to introduce evidence in opposition to it.

### A. E & Y's Consent to Include its Audit Opinion in JWP's Registration Statement did not "Enable" the Acquisition to Take Place

44. E & Y did not give its consent to include its audit opinion in the Registration Statement relating to the Businessland merger until October 14, 1991, two months after the tender offer was complet-

ed. (*See* PX 88 at EYM008117 (E & Y consent).)

45. JWP did not wait for the subsequent merger to be completed before it began investing in and controlling Businessland's operations. (*See* Tr. 4661 (Dwyer) (JWP had "operating control" and made unsecured loans to Businessland after the tender offer and before the merger); Tr. 4793 (Dwyer) (integration process started in September 1991); PX 561 at AYA000140–41 (9/19/91 Board Minutes, discussing integration).) In addition, as required by GAAP, JWP consolidated its financial results with Businessland's as of August 2, 1991, the date the tender offer was completed. (DX 417 at 10 (Form 10Q, 9/30/91).)

46. Thus, if E & Y had either withheld the use of its opinion or issued a qualified opinion, the Businessland acquisition would not have been stopped; it had already taken place. Although JWP might not have been able to proceed with the merger, the tender offer was already complete. JWP would have been forced either to leave Businessland as a majority-owned subsidiary or to cure the misstatements in its financial statements so that E & Y would be able to give its consent to include an unqualified opinion in a Registration Statement at a later time. There is no evidence that either of those potential consequences would likely have lessened or changed the ultimate impact of Businessland on JWP. Thus, plaintiffs have failed to prove that the Businessland acquisition would not have occurred absent E & Y's alleged misconduct.

### CONCLUSION

47. JWP defaulted on plaintiff's notes not because of any weakness in its financial condition or any lack of integrity of its executives which was concealed by its annual reports certified by E & Y, but because of post-audit developments which could not reasonably be foreseen, including JWP's disastrous acquisition of the failing Businessland, in combination with vicious

**394**

price competition in personal computer sales and a sharp drop in commercial construction. These developments would have caused JWP's insolvency and its default on plaintiffs's notes even if JWP's financial condition had been fully as strong as was indicated in its annual reports audited by E & Y.

**SO ORDERED.**